UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

VINCENT FREDRICS BANDA,

                Petitioner,

    v.

KIRSTJEN NIELSEN, et al.,

                Respondents.

Case No. C18-1841-JLR-MAT

REPORT AND RECOMMENDATION

I.      <u>INTRODUCTION</u>

Petitioner, who is currently detained at the Northwest Detention Center in Tacoma, Washington, bring this 28 U.S.C. § 2241 immigration habeas action through counsel. He contends that his prolonged detention without a bond hearing violates the Fifth and Eighth Amendments. *See* Dkt. 1. The Government has moved to dismiss, arguing that U.S. Immigration and Customs Enforcement ("ICE") has the statutory authority to detain petitioner under 8 U.S.C. § 1225(b) and that he has been afforded all the benefits of due process to which he is entitled. Dkt. 6; *see also* Dkt. 10. Petitioner opposes dismissal and requests oral argument. Dkt. 9. The parties fail to address petitioner's Eighth Amendment claim in their briefing.

Having considered the parties' submissions, the balance of the record, and the governing

REPORT AND RECOMMENDATION - 1

law, the Court denies petitioner's request for oral argument[1] and recommends that the Government's motion to dismiss be denied, petitioner's habeas petition be granted, and the Government be ordered to provide petitioner with an appropriate bond hearing.

## II.    BACKGROUND

Petitioner is a native and citizen of Malawi.  Dkt. 7 at ¶ 3.  On September 14, 2017, before coming to the United States, he submitted a nonimmigrant visa application ("DS160") to the U.S. Department of State.  *Id.* at ¶ 4.  The application was written in English, and in response to a list of languages spoken, petitioner listed only English.  *Id.*  Petitioner indicated his purpose for travel to the United States was for tourism and that he planned to stay with a friend, Calla Brown, in Parkway, Minnesota.  *Id.*  On or about September 20, 2017, a consular official interviewed him at the U.S. Embassy in Lilongwe, Malawi.  *Id.* at ¶ 5.  The interview was conducted in English, which is the official language of Malawi.  *Id.*  According to the interviewing official's recorded remarks, petitioner indicated his intent to visit Ms. Brown in Minnesota for two weeks and that he met her when she worked at a local Malawian hospital where petitioner supplied food.  *Id.*  On September 21, 2017, the Department of State approved petitioner's application and issued him a B1/B2 nonimmigrant visitor visa.  *Id.*

On November 8, 2017, petitioner arrived at the Seattle-Tacoma International Airport and applied for admission to the United States.  *Id.* at ¶ 6; Dkt. 8-2.  Petitioner presented his passport containing the B1/B2 visa to the U.S. Customs and Border Protection Inspecting Officer ("CBPO"), along with a Customs Form 6059B, which he had completed in English.  Dkt. 7 at ¶ 6. Petitioner told the CBPO that he wanted to travel to the United States to see his friend Calla Brown

---

[1] The parties have thoroughly briefed the issues and oral argument would not be of assistance to the Court. *See Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998) (court may deny request for oral argument when parties submit briefs to the court).

REPORT AND RECOMMENDATION - 2

in Minnesota.  *Id.*  Petitioner presented the CBPO with an invitation letter, written in English, purportedly by Ms. Brown, along with a copy of the face page of Ms. Brown's U.S. passport.  *Id.*; Dkt. 8-3.  The CBPO determined that petitioner warranted further inspection and referred him to passport control secondary.  Dkt. 7 at ¶ 6.

During the secondary inspection, the CBPO gave petitioner instructions in English and petitioner indicated his understanding of what was said to him and swore an oath to tell the truth during that interview.  *Id.* at ¶ 7; Dkt. 8-4.  Petitioner proceeded to repeat his claim that he knew Ms. Brown, had met her in Malawi, and she had sent him the invitation letter that he used to obtain his nonimmigrant visa.  Dkt. 7 at ¶ 7; Dkt. 8-2 at 3; Dkt. 8-4 at 5-6.  Because the invitation letter contained numerous grammatical errors, a CBPO contacted Ms. Brown to verify petitioner's story. Dkt. 8-2 at 3.  Ms. Brown confirmed that she had worked as an aid worker in Malawi, but she denied meeting petitioner, writing the letter, inviting him to visit, or providing him with a copy of her passport.  Dkt. 7 at ¶ 7; Dkt. 8-2 at 3; Dkt. 8-4 at 6.  When the CBPO confronted petitioner with this information, he continued to maintain that Ms. Brown had sent the invitation letter.  Dkt. 7 at ¶ 7; Dkt. 8-2 at 3; Dkt. 8-4 at 6.  Petitioner also claimed a fear of return to Malawi.  Dkt. 7 at ¶ 7; Dkt. 8-2 at 3; Dkt. 8-4 at 7.  Based on the totality of the evidence, the CBPO determined that petitioner was inadmissible under 8 U.S.C. § 1182(a)(7)(A)(i)(I) as an arriving noncitizen without a valid visa.  Dkt. 7 at ¶ 7; Dkt. 8-2 at 3; Dkt. 8-4 at 7; Dkt. 8-7.

CBP then transferred him to ICE custody at the Northwest Detention Center for proceedings under 8 U.S.C. § 1225, which provides noncitizens an opportunity to demonstrate to an asylum officer that they have a credible fear of returning to their country of origin.  Dkt. 7 at ¶ 7; Dkt. 8-2 at 3-4; Dkt. 8-4 at 7; Dkt. 8-5.  ICE referred petitioner's claim to U.S. Citizenship and Immigration Services ("USCIS") for an interview with an asylum officer.  Dkt. 7 at ¶ 7.  On

REPORT AND RECOMMENDATION - 3

1   November 22, 2017, an asylum officer attempted to interview petitioner but was unable to schedule

2   a translator who spoke Chichewa, petitioner's primary language. Dkt. 7 at ¶ 9; Dkt. 8-9

3   (memorandum to petitioner's USCIS file stating, "It was determined that the credible fear

4   interview would need to be conducted in Chichewa."). To avoid "an undue delay in the processing

5   of the case and to afford the applicant all possible avenues to have his claim of fear heard," the

6   asylum officer issued petitioner a Notice to Appear ("NTA") for removal proceedings in

7   immigration court so that he could pursue his asylum claim. Dkt. 8-9; *see also* Dkt. 7 at ¶ 10; Dkt.

8   8-8. After being placed in removal proceedings, ICE gave petitioner instructions in English

9   regarding how to seek release from detention; petitioner indicated that he understood the

10   instructions. Dkt. 8-6.

11        On January 9, 2018, petitioner appeared for a master calendar hearing.[2] Dkt. 7 at ¶ 11;

12   Dkt. 8-10 at 2. After petitioner asked to proceed in Chichewa, the immigration judge ("IJ") reset

13   the case for February 20, 2018, so that an interpreter could be scheduled. Dkt. 7 at ¶ 11; Dkt. 8-

14   10 at 3.

15        On February 20, 2018, a telephonic Nyanja interpreter was provided for petitioner's master

16   calendar hearing. Dkt. 7 at ¶ 13. Chichewa and Nyanja are considered the same language,

17   although there can be some local variants. *Id.* at ¶ 13 n.1. Petitioner, however, had difficulty

18   understanding the interpreter and the IJ continued the case to April 9, 2018, to secure a different

19   interpreter. *Id.* at ¶ 13; Dkt. 8-10.

20        While he waited for his April hearing, petitioner requested a bond hearing. Dkt. 7 at ¶ 14;

21   Dkt. 8-11. On March 7, 2018, the IJ denied bond, concluding that she lacked jurisdiction to hold

---

[2] Immigration proceedings involve two types of hearings. Master calendar hearings address scheduling, pleadings, and other administrative matters, while individual calendar hearings, also referred to as merits hearings, concern the merits of a noncitizen's application for relief from removal. *See* Imm. Ct. Prac. Manual §§ 4.15-4.16.

a bond hearing because petitioner is an arriving noncitizen subject to mandatory detention. Dkt. 7 at ¶ 15; Dkt. 8-12. Petitioner waived appeal. Dkt. 8-12.

At the master calendar hearing on April 9, 2018, a Nyanja interpreter was present, and petitioner denied the charges in the NTA. Dkt. 7 at ¶ 16. The U.S. Department of Homeland Security ("DHS") requested a continuance so it could determine whether to amend the NTA, provide additional evidence, or set the case for a contested removal hearing. *Id.* The IJ continued the case until April 24, 2018. *Id.* at ¶ 17; Dkt. 8-10 at 5.

At the master calendar hearing on April 24, 2018, a Nyanja interpreter was present. Dkt. 7 at ¶ 17. DHS informed the IJ that it was not going to amend the NTA, and the IJ set the case for a contested removal hearing on May 29, 2018, for the sole purpose of deciding whether petitioner was inadmissible.[3] *Id.*

On May 21, 2018, petitioner filed an application for asylum. *Id.* at ¶ 19.

On May 29, 2018, a Chichewa/Nyanja interpreter was not available for petitioner's contested removal hearing. Dkt. 7 at ¶ 20. The IJ had a discussion with petitioner in English about the possibility of proceeding in English, but petitioner chose to continue to proceed in Chichewa. *Id.* The IJ reset the case to October 31, 2018, so that an interpreter could be secured. *Id.*

A Nyanja interpreter was scheduled to appear for the October 31, 2018 hearing, however the interpreter failed to answer the phone after repeated attempts to contact her, and an alternate interpreter was not available. *Id.* at ¶ 21. The IJ reset the case to February 26, 2019. *Id.*

On February 26, 2019, a translator was present for the merits hearing. Dkt. 12-1 at 4, 11. Petitioner admitted the factual allegations in the NTA and the IJ sustained the charge of

---

[3] In his unverified habeas petition, petitioner claims that he had difficulty understanding the Nyanja interpreter during the April 9, 2018, and April 24, 2018 hearings. Dkt. 1 at ¶¶ 34-35. Petitioner does not submit a declaration or affidavit attesting to these statements.

removability. *Id.* at 4. The IJ denied petitioner's application for asylum, withholding of removal,

and protection under the Convention Against Torture, and ordered petitioner removed to Malawi.

*Id.* at 24. In the IJ's written decision, he indicated that petitioner "had a little difficulty here and

there with the translator but he understood everything" and the translator understood petitioner.

*Id.* at 11. The IJ also addressed petitioner's claim that he does not understand the English language

well, finding that the evidence in the record belied this contention:

> [Petitioner] received twelve years of public education and the evidence in the record establishes that English is the official language in Malawi and that "adequate knowledge of the English language" is a prerequisite for naturalized citizenship—strong circumstantial evidence that the English-language is widely used in Malawi. Exh. 4B at 2, 66. [Petitioner] testified that English is a common language in Malawi and that he lived in South Africa for seven years—a country where English is commonly spoken and where [petitioner] ran his own business. [Petitioner's] visa application was prepared in English and [petitioner] communicated in English during his consular interview in Malawi. *See also* Exh. 7 at 5 (listing English as a language [petitioner] speaks). Further, although [petitioner] testified that he only spoke in English to the CBP Agent because a translator could not be found, [petitioner] stated that he understood a several paragraph advisal that was read to him in English before a question-and-answer session, and the content of the Form I-867A establishes that [petitioner] fully understood his interview and was able to clearly communicate complex ideas. Exh. 2 at 4 ("Q: Do you understand what I have said to you in the English language? A: Yes I understand."). For example, [petitioner] reacted emotionally when he was confronted with evidence of his fraudulent visa application: "I am very very sad." *Id.* at 5. Additionally, [petitioner's] Form I-589 and signed declaration were prepared in English, and he filed complex *pro se* motions in English, and there is no evidence that any of those documents were translated from English to Chichewa. Exh. 3 at 17 ("The statement above was prepared with help. *I have reviewed this statement* it is true to the best of my knowledge.") (emphasis added); Exh. 4A ("I have done my best to speak in English, but my English is very limited and I do not feel that I could present my case in anything but my native language Chichewa."). The court also notes that [petitioner] repeatedly answered questions *before* they were translated from English to Nyanja[4]—additional circumstantial evidence that [petitioner] was able to fully communicate to the consular officer and CBP Agent in the English-language.

---

[4] [IJ Footnote 2] Chichewa and Nyanja are dialects of the same language: Chichewa is spoken in Malawi, while Nyanja is spoken in Zambia. The court's translator explained that she had not have [sic] any difficulty communicating with [petitioner] in Nyanja on February 26, 2019. [Petitioner] likewise indicated at the conclusion of the hearing that he understood the Nyanja interpreter.

REPORT AND RECOMMENDATION - 6

Dkt. 12-1 at 14-16.  The IJ thus found that petitioner fully understood his conversations with the consular official who interviewed him regarding his visa application and the CBPO at the airport. *Id.* at 16.  Ultimately, the IJ found that petitioner failed to provide credible testimony.  *Id.*

On March 11, 2019, petitioner appealed the IJ's decision to the Board of Immigration Appeals ("BIA").  Dkt. 13.

Petitioner has remained in detention since his arrest on November 8, 2017—approximately 17 months—and has not had the opportunity to contest his continued detention at a bond hearing.

III.    DISCUSSION

The instant habeas petition challenges the constitutionality of petitioner's mandatory detention under the Fifth Amendment's Due Process Clause and the Eighth Amendment's Excessive Bail Clause.  The Court begins by explaining the statutory framework for immigration detention and federal courts' interpretation of those statutes, and then turns to the merits of petitioner's Fifth Amendment claim.  Finally, the Court addresses the Eighth Amendment claim. As discussed below, the Court concludes that petitioner's continued mandatory detention violates the Fifth Amendment and that he is entitled to a bond hearing; he is not, however, entitled to relief under the Eighth Amendment.

A.    Statutory framework for immigration detention

Three statutes govern immigration detention.  *See* 8 U.S.C. §§ 1225, 1226, 1231.  Although only one applies to petitioner, § 1225, the Court briefly discusses each to provide context for the discussion below regarding petitioner's due process rights.

Section 1225 applies to "applicants for admission"—noncitizens who "arrive[] in the United States," or are "present" in the United States but have "not been admitted."  8 U.S.C. §

1225(a)(1).[5]   There are two categories of applicants for admission, those who fall under §
1225(b)(1) and those who fall under § 1225(b)(2).   The parties agree that petitioner falls under §
1225(b)(1), which applies to, among others, noncitizens initially determined to be inadmissible
because of fraud, misrepresentation, or lack of valid documentation.   *See Jennings v. Rodriguez*,
138 S. Ct. 803, 837 (2018) (citing § 1225(b)(1)(A)(i)).   Normally, noncitizens covered by §
1225(b)(1) are subject to an expedited removal process that does not include a hearing before an
IJ or review of the removal order.   8 U.S.C. § 1225(b)(1)(A)(i).   If, however, a § 1225(b)(1)
noncitizen "indicates either an intention to apply for asylum . . . or a fear of persecution," the
inspecting immigration officer must refer the noncitizen for an interview with an asylum officer.
8 U.S.C. § 1225(b)(1)(A)(ii); 8 C.F.R. § 208.30(d).   If the asylum officer determines that the
noncitizen has a credible fear of persecution, the noncitizen "shall be detained for further
consideration of the application for asylum."   8 U.S.C. § 1225(b)(1)(B)(ii).   Under the statute, the
only opportunity for a noncitizen to be released pending a decision on the asylum application is
temporary parole "for urgent humanitarian reasons or significant public benefit."   8 U.S.C. §
1182(d)(5)(A); *see also* 8 C.F.R. §§ 212.5(b), 235.3.   The statute does not impose "any limit on
the length of detention" pending a decision on the asylum application and does not authorize bond
hearings or release on bond.   *Jennings*, 138 S. Ct. at 842-45.

Section 1226 provides the framework for the arrest, detention, and release of noncitizens
who are in removal proceedings.   Section 1226(a) grants DHS the discretionary authority to
determine whether a noncitizen should be detained, released on bond, or released on conditional
parole pending the completion of removal proceedings, unless the noncitizen falls within one of

---

[5] Applicants for admission are also referred to as "arriving" noncitizens.   8 C.F.R. § 1001.1 ("Arriving [noncitizen] means an applicant for admission coming or attempting to come into the United States at a port-of-entry, or [a noncitizen] seeking transit through the United States at a port-of-entry[.]").

the categories of criminals described in § 1226(c), for whom detention is mandatory until removal proceedings have concluded.[6]  8 U.S.C. § 1226; *Jennings*, 138 S. Ct. at 846-48.  When a noncitizen is arrested and taken into immigration custody pursuant to § 1226(a), ICE makes an initial custody determination, including the setting of bond.  *See* 8 C.F.R. § 236.1(c)(8).  After the initial custody determination, the detainee may request a bond redetermination by an IJ.[7]  8 C.F.R. § 236.1(d)(1).  Once an IJ has made an initial bond redetermination, a detainee's request for a subsequent bond redetermination must be made in writing and must show that the detainee's circumstances have changed materially since the prior bond redetermination.  8 C.F.R. § 1003.19(e).

Section 1231 governs the detention and release of noncitizens who have been ordered removed.  During the "removal period," which typically lasts 90 days, detention is mandatory.  8 U.S.C. § 1231(a)(2).  The removal period is triggered by the latest of the following: (1) the date the order of removal becomes administratively final; (2) if the removal order is judicially reviewed and if a court orders a stay of the removal, the date of the court's final order; or (3) if the noncitizen is detained or confined (except under an immigration process), the date the noncitizen is released from detention or confinement.  8 U.S.C. § 1231(a)(1)(B).  If ICE is unable to remove the noncitizen during the removal period, DHS may continue to detain certain noncitizens specified in the statute or release them under an order of supervision.  8 U.S.C. § 1231(a)(6).  Section 1231(a)(6), however, does not authorize indefinite detention.  *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001).  In addition, the Ninth Circuit has held that noncitizens subject to prolonged detention

---

[6] Although the relevant statutory sections refer to the Attorney General, the Homeland Security Act of 2002, Pub. L. No. 107-296 § 471, 116 Stat. 2135 (2002), transferred most immigration law enforcement functions from the Department of Justice ("DOJ") to DHS, while the DOJ's Executive Office for Immigration Review retained its role in administering immigration courts and the BIA.  *See Hernandez v. Ashcroft*, 345 F.3d 824, 828 n.2 (9th Cir. 2003).

[7] The Honorable Marsha J. Pechman recently issued an order granting bond hearings for certain asylum seekers detained under § 1226(a), finding evidence that the government regularly delayed providing these detainees with their requested hearings.  *See Padilla v. U.S. Imm. & Customs Enforcement*, No. 18-928, 2019 WL 1506754 (W.D. Wash. Apr. 5, 2019).

under § 1231(a)(6) are entitled to a bond hearing. *Diouf v. Napolitano* ("*Diouf II*"), 634 F.3d 1081, 1082 (9th Cir. 2011).

To summarize, §§ 1225(b) and 1226(c) mandate detention without a bond hearing until removal proceedings have concluded, even if the detention becomes prolonged. *Jennings*, 138 S. Ct. at 842, 847. Section 1226(a) permits prolonged detention while removal proceedings are pending but gives noncitizens the opportunity to request a bond hearing. Section 1231(a) requires detention during the removal period but authorizes DHS to release certain noncitizens after the removal period; noncitizens detained for a prolonged period under § 1231(a)(6) are entitled to a bond hearing in the Ninth Circuit and cannot be held indefinitely.

B.   Overview of caselaw interpreting the immigration detention statutes

This case raises the question of whether and if so, when, due process requires a bond hearing for noncitizens subject to mandatory detention under § 1225(b)(1). Neither the Supreme Court nor any Court of Appeals has answered the question, and district courts around the country have taken different approaches. The Court summarizes the relevant caselaw below.

1.   *Supreme and Circuit Court authority*

"[I]n a series of decisions since 2001, the Supreme Court and [Ninth Circuit] have grappled in piece-meal fashion with whether the various immigration detention statutes may authorize indefinite or prolonged detention of detainees and, if so, may do so without providing a bond hearing." *Rodriguez v. Robbins* ("*Rodriguez III*"), 804 F.3d 1060, 1067 (9th Cir. 2015), *rev'd sub nom Jennings v. Rodriguez*, 138 S. Ct. 830 (2018). First, in *Zadvydas*, the Supreme Court addressed § 1231(a)(6), which authorizes detention beyond the 90-day removal period for noncitizens who are subject to final orders of removal. 533 U.S. at 678. The petitioners claimed that they were being held indefinitely because the government could not execute their removal

orders.  The Supreme Court reasoned:

> A statute permitting indefinite detention of [a noncitizen] would raise a serious constitutional problem.  The Fifth Amendment's Due Process Clause forbids the Government to "depriv[e]" any "person . . . of . . . liberty . . . without due process of law."  Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects. *See Foucha v. Louisiana*, 504 U.S. 71, 80 (1992).  And this Court has said that government detention violates that Clause unless the detention is ordered in a criminal proceeding with adequate procedural protections, *see United States v. Salerno*, 481 U.S. 739, 746 (1987), or, in certain special and "narrow" nonpunitive "circumstances," *Foucha*, *supra*, at 80, where a special justification, such as harm-threatening mental illness, outweighs the "individual's constitutionally protected interest in avoiding physical restraint."  *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997).

*Id.* at 690.  To avoid "serious constitutional concerns," the Court applied the canon of constitutional avoidance and held that § 1231(a)(6) does not authorize indefinite detention without a bond hearing and instead contains "an implicit 'reasonable time' limitation." *Id.* at 683, 699.  The Court noted that it had reason to believe "Congress previously doubted the constitutionality of detention for more than six months," and thus "for the sake of uniform administration of the federal courts," recognized a presumptively reasonable six-month period of post-removal order detention.  *Id.* at 701.  After six months, once a noncitizen "provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing."  *Id.*  The Court noted, however, that the six-month presumption did not establish a bright-line rule for release; rather, a noncitizen "may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future."  *Id.*

Next, in *Demore v. Kim*, 538 U.S. 510 (2003), the Supreme Court considered a due process challenge to § 1226(c), which mandates detention during removal proceedings for noncitizens convicted of certain crimes.  The Court explained that Congress drafted § 1226(c) to respond to

1   the high rates of crime and flight by removable noncitizens and held that "the Government may

2   constitutionally detain deportable [noncitizens] during the limited period necessary for their

3   removal proceedings." *Id.* at 518-21, 526.  In so holding, the Court stressed the "brief" nature of

4   the mandatory detention under § 1226(c), which has "a definite termination point" that, in the vast

5   majority of cases, resulted in detention of less than about five months.  *Id.* at 529-30.  Justice

6   Kennedy's concurring opinion, which created the majority, reasoned that under the Due Process

7   Clause, a noncitizen could be entitled to "an individualized determination as to his risk of flight

8   and dangerousness if the continued detention became unreasonable or unjustified." *Id.* at 532.

9          Since *Zadvydas* and *Demore*, the Ninth Circuit has recognized that prolonged immigration

10  detention without adequate procedural protections would raise "serious constitutional concerns."

11  *Casas-Castrillon v. Dep't of Homeland Sec.*, 535 F.3d 942, 950 (9th Cir. 2008) (addressing

12  detention under § 1226(a)); *Diouf II*, 634 F.3d at 1086 (addressing detention under § 1231(a)(6));

13  *see also Rodriguez v. Robbins* ("*Rodriguez II*"), 715 F.3d 1127, 1137, 1144 (9th Cir. 2013)

14  (prolonged detention under §§ 1225(b) and 1226(c) without a bond hearing would be

15  "constitutionally doubtful"); *Tijani v. Willis*, 430 F.3d 1241, 1242 (9th Cir. 2005) (holding that

16  constitutionality of 32-month detention under § 1226(c) was "doubtful").  To avoid these concerns,

17  the Ninth Circuit applied the canon of constitutional avoidance to §§ 1225(b), 1226(a), 1226(c),

18  and 1231(b)(6), and held that the statutes implicitly limit mandatory detention to six months, at

19  which time the government must justify continued detention by presenting clear and convincing

20  evidence of dangerousness or flight risk at an individualized bond hearing.  *See Rodriguez III*, 804

21  F.3d at 1078-1085 (addressing §§ 1225(b), 1226(a), and 1226(c)); *Diouf II*, 634 F.3d at 1092

22  (addressing § 1231(b)(6)); *Singh v. Holder*, 638 F.3d 1196, 1023, 1026, 1028 (9th Cir. 2011)

23  (clarifying procedural requirements for prolonged detention bond hearings).  With respect to §§

REPORT AND RECOMMENDATION - 12

1225(b), 1226(a), and 1226(c), the Ninth Circuit further held that bond hearings were required every six months and that at the hearings, the IJ must consider restrictions short of detention. *Rodriguez III*, 804 F.3d at 1087-89.

The other circuit courts that addressed prolonged mandatory detention under § 1226(c) also "recognized that the Due Process Clause imposed some form of 'reasonableness' limitation upon the duration of detention that can be considered justifiable under that statute," and each circuit "read an implicit reasonableness requirement into the statute itself, generally based on the doctrine of constitutional avoidance." *Reid v. Donelan*, 819 F.3d 486, 494 (1st Cir. 2016), *vacated in light of Jennings*, 2018 WL 40000993 (1st Cir. May 11, 2018) (citing *Lora v. Shanahan*, 804 F.3d 601, 606 (2d Cir. 2015), *vacated*, 138 S. Ct. 1260 (2018); *Rodriguez II*, 715 F.3d at 1138; *Diop v. ICE/Homeland Sec.*, 656 F.3d 221, 222-23 (3d Cir. 2011), *abrogated by Jennings*, 138 S. Ct. 830; *Ly v. Hansen*, 351 F.3d 263, 269-70 (6th Cir. 2003)[8]); *see also Sopo v. U.S. Att'y Gen.*, 825 F.3d 1199 (11th Cir. 2016), *vacated*, 890 F.3d 952 (11th Cir. 2018) ("[A]s a matter of constitutional avoidance, we readily join other circuits in holding that § 1226(c) 'implicitly authorizes detention for a reasonable amount of time . . . .'" (quoting *Diop*, 656 F.3d at 231)). These circuits, however, divided on how to determine whether a bond hearing was required. The Second Circuit joined the Ninth Circuit in establishing a bright-line rule requiring a bond hearing after six months detention. *Lora*, 804 F.3d at 616. The other circuits adopted a "case-by-case" approach that turned on the facts of each case. *Sopo*, 825 F.3d at 1214-15 (summarizing holdings of the First, Third, and Sixth Circuits before adopting the case-by-case approach for the Eleventh Circuit). This approach was driven by the "core principle" that "the reasonableness of any given detention pursuant to § 1226(c)

---

[8] It appears that *Jennings* abrogated *Ly*'s reliance on the canon of constitutional avoidance to construe § 1226(c); however, courts citing *Ly* post-*Jennings* have not so recognized. *See, e.g.*, *Sajous v. Decker*, No. 18-2447, 2018 WL 2357266, at *9 (S.D.N.Y. May 23, 2018).

1  is a function of whether it is necessary to fulfill the purpose of the statute." *Id.* at 1217 (quoting

2  *Diop*, 656 F.3d at 234, and citing *Zadvydas* and *Demore*).  To make this determination, the courts

3  identified a non-exhaustive list of factors to serve as "guideposts" for lower courts conducting a

4  reasonableness review.  *E.g.*, *id.* at 1218 (quoting *Reid*, 819 F.3d at 501).  For example, the

5  Eleventh Circuit identified the amount of time the noncitizen had been in detention without a bond

6  hearing, why the removal proceedings had become protracted, whether it will be possible to

7  remove the noncitizen if there is a final order of removal, whether the noncitizen's immigration

8  detention exceeded the time the noncitizen spent in prison for the crime that rendered him

9  removable, and whether the immigration detention facility was meaningfully different from a

10  criminal penal institution.  *Id.* at 1217-18.

11       In *Jennings*, the Supreme Court reversed *Rodriguez III*, holding that the Ninth Circuit

12  erroneously applied the canon of constitutional avoidance and that the plain text of §§ 1225(b),

13  1226(a), and 1226(c) unambiguously authorizes detention pending resolution of removal

14  proceedings and does not plausibly suggest a 6-month limitation or periodic bond hearings.

15  *Jennings*, 138, S. Ct. at 842, 846-47.  Rather than considering the parties' constitutional due

16  process arguments, the Court remanded to the Ninth Circuit for further proceedings.  *Id.* at 851-

17  52.  The Ninth Circuit, in turn, remanded to the district court to determine "the minimum

18  requirements of due process" for noncitizens detained under each statute.  *Rodriguez v. Marin*

19  ("*Rodriguez IV*"), 909 F.3d 252, 255 (9th Cir. 2018) (quoting *Morrissey v. Brewer*, 408 U.S. 471,

20  488-89 (1972)).  In doing so, the Ninth Circuit expressed "grave doubts that any statute that allows

21  for arbitrary prolonged detention without any process is constitutional or that those who founded

22  our democracy precisely to protect against the government's arbitrary deprivation of liberty would

23  have thought so."  *Id.* at 256.

REPORT AND RECOMMENDATION - 14

2.      *Post*-Jennings *District Court authority*

In the wake of *Jennings*, district courts have grappled with how to address due process challenges to prolonged mandatory detention under § 1225(b).  Nearly all district courts that have considered the issue agree that "prolonged mandatory detention pending removal proceedings, without a bond hearing, 'will—at some point—violate the right to due process.'"  *Bermudez Paiz v. Decker*, No. 18-4759, 2018 WL6928794, at *9 - *10 (S.D.N.Y. Dec. 27, 2018) (R & R) (quoting *Sajous v. Decker*, No. 18-2447, 2018 WL 2357266, at *8 (S.D.N.Y. May 23, 2018), and collecting district court cases from the Second Circuit); *see also Jamal v. Whitaker*, 358 F. Supp. 3d 853, at *2 - *3 (D. Minn. 2019); *Kouadio v. Decker*, 352 F. Supp. 3d 235, 241 (S.D.N.Y. 2018); *Tuser v. Orlando Rodriguez*, No. 18-4801, 2019 WL 928419, at *4 (D.N.J. Feb. 25, 2019); *De Ming Wang v. Brophy*, No. 17-6263, 2019 WL 112346, at *3 (W.D.N.Y. Jan. 4, 2019); *Fatule-Roque v. Lowe*, No. 17-1981, 2018 WL 3584696, at *5 (M.D. Penn. July 26, 2018) (collecting cases from the Middle District of Pennsylvania); *Otis v. Green*, No. 18-742, 2018 WL 3302997, at *7 - *8 (D.N.J. July 5, 2018).[9]

To analyze whether due process requires a bond hearing in a particular case, most courts take one of two analytical approaches.  Some courts rest their decisions predominately on the length of the noncitizen's detention.  *See Kouadio*, 352 F. Supp. 3d at 241 (granting bond hearing where the petitioner had been detained for 34 months); *Pierre v. Doll*, 350 F. Supp. 3d 327, 332 (M.D. Penn. 2018) (granting bond hearing where the petitioner had been detained for two years);

---

[9] *But see Poonjani v. Shanahan*, 319 F. Supp. 3d 644, 650 (S.D.N.Y. 2018) (holding that for a noncitizen "at the threshold of initial entry" for immigration purposes, "the Constitution extends no farther than [the] statutory language" of § 1225(b), and therefore that an applicant for admission may be detained indefinitely pursuant to § 1225(b) with no recourse); *Alexandre v. Decker*, No. 17-5706, 2018 WL 5619975, at *9 - *10 (S.D.N.Y. Aug. 28, 2018) (R & R) (reasoning that even applicants for admission are entitled to "a base level of procedural due process," but that the discretionary parole process itself "satisfie[d] this base level of due process" for an asylum applicant detained for 21 months pursuant to § 1225(b)).

1  *De Ming Wang*, 2019 WL 112346, at *3 (granting bond hearing where the petitioner had been

2  detained for more than two years); *Destine v. Doll*, No. 17-1340, 2018 WL 3584695, at *5 (M.D.

3  Penn. Jul. 26, 2018) (granting bond hearing where the petitioner had been detained for 21 months);

4  *Otis*, 2018 WL 3302997, at *8 (denying bond hearing where the petitioner had been detained for

5  just over a year).

6         Other courts engage in a case-specific analysis that involves consideration of several

7  factors derived from *Zadvydas*, *Demore*, and the First, Third, Sixth, and Eleventh Circuits' pre-

8  *Jennings* decisions regarding the reasonableness of prolonged detention under § 1226(c), discussed

9  above.  *See Jamal*, 358 F. Supp. 3d 853, at *3 (adopting factors developed in § 1226(c) cases in

10  action involving § 1225(b)); *Lett v. Decker*, 346 F. Supp. 3d 379, 387-88 (S.D.N.Y. 2018) (same);

11  *Brissett v. Decker*, 324 F. Supp. 3d 444, 452-53 (S.D.N.Y. 2018) (same); *Bermudez Paiz*, 2018

12  WL 6928794, at *10 (same); *Perez v. Decker*, No. 18-5279, 2018 WL 3991497, at *4 - *5

13  (S.D.N.Y. Aug. 20, 2018) (same); *see also Tuser*, 2019 WL 928419, at *4 - *5 (discussing several

14  factors to determine reasonableness of continued detention without formally adopting multi-factor

15  test); *Gichuhi v. Doll*, No. 17-1041, 2018 WL 5660744, at *4 (M.D. Penn. Aug. 21, 2018) (same);

16  *Fatule-Roque*, 2018 WL 3584696, at *6 (same).  Those factors include "(1) the total length of

17  detention to date; (2) the likely duration of future detention; (3) the conditions of detention; (4)

18  delays in the removal proceedings caused by the detainee; (5) delays in the removal proceedings

19  caused by the government; and (6) the likelihood that the removal proceedings will result in a final

20  order of removal."  *Jamal*, 358 F. Supp. 3d 853, at *3; *see also Sajous*, 2018 WL 2357266, at *10

21  - *11 (explaining origin of factors).

22  C.    Petitioner's prolonged detention is unreasonable

23         Having considered the above authority, the Court joins the vast majority of other district

courts to conclude that unreasonably prolonged detention under § 1225(b) without a bond hearing violates due process.  This conclusion aligns with the Ninth Circuit's recent pronouncement in *Rodriguez IV* that it has "grave doubts that any statute that allows for arbitrary prolonged detention without any process is constitutional," 909 F.3d at 255, as well as Justice Kenney's concurring opinion in *Demore*, 538 U.S. at 532 (Kennedy, J., concurring) ("[S]ince the Due Process Clause prohibits arbitrary deprivations of liberty, a lawful permanent resident [detained under § 1226(c)] could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified.").

The question, then, is how the Court should determine whether a noncitizen's prolonged mandatory detention has become unreasonable.  Petitioner asks the Court to adopt a bright-line rule that detention becomes unreasonably prolonged at six months. Dkt. 1 at ¶ 56; Dkt. 9 at 10. Citing *Zadvydas*, petitioner asserts, "*Jennings* did nothing to overrule the constitutional presumption that detention following six months is unconstitutional and requires the government to justify continued detention." Dkt. 9 at 8.  Petitioner misreads *Zadvydas*. *Zadvydas* did not establish a constitutional presumption that detention longer than six months is unconstitutional. Rather, the Supreme Court established that at six months, a § 1231(a)(6) detainee could be released if he or she came forward with "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," at which time the government would be required to rebut that showing. *Zadvydas*, 533 U.S. at 701.  Thus, at six months, the burden is on the detainee—not the government—to establish a basis for release. *Id.* (emphasizing that a noncitizen "may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future").  The Court also declines to adopt a six-month rule based on *Rodriguez III* and *Lora*. Such a rule is inconsistent with the fact-dependent nature of the

constitutional question before the Court, namely whether petitioner's prolonged detention has become unreasonable.  *See Diop*, 656 F.3d at 234 ("Reasonableness, by its very nature, is a fact-dependent inquiry requiring an assessment of all the circumstances of any given case."); *Sopo*, 825 F.3d 1215-17 (explaining why case-by-case approach is better-aligned with reasonableness test than bright-line rule); *Reid*, 819 F.3d at 495-98 (same).

Alternatively, petitioner advocates for a case-specific analysis similar to what other district courts have adopted.  Dkt. 1 at ¶ 58; Dkt. 9 at 10.  The Government does not address the multi-factor approach, outlined above, and instead bases its analysis on *Mathews v. Eldridge*, 424 U.S. 319 (1976).  Dkt. 6 at 10-12.  In *Mathews*, the Supreme Court articulated a three-part test to determine whether established procedures provide constitutionally sufficient due process.  424 U.S. at 334-35.  To determine the specific dictates of due process in a given situation, *Mathews* requires consideration of (1) the private interest affected by government action; (2) the risk of an erroneous deprivation of the private interest through the procedures used, and the probable value, if any, of additional or alternative procedures; and (3) the government's interest, including the function involved and the burdens that additional or alternative procedures would entail.  *Id.*  The Government points to two post-*Jennings* district court cases applying the *Mathews* test, but both involved noncitizens who were detained under § 1226(a), had already received a constitutionally sufficient bond hearing, and were seeking a second hearing.  *Viramontes-Gomez v. Nielsen*, No. 18-935, 2018 WL 6111015, at *4 (W.D. Wash. Oct. 18, 2018), *R & R adopted*, 2018 WL 6107293 (W.D. Wash. Nov. 21, 2018); *Soto v. Sessions*, No. 18-2891, 2018 WL 3619727, at *3 - *5 (N.D. Cal. July 30, 2018).  The Court is aware of only one § 1225(b) case that applied the *Mathews* factors, and that case is distinguishable from the instant action because the petitioner had already received, prior to *Jennings*, a *Rodriguez III* bond hearing and was seeking a second hearing.  *Singh*

1  *v. Nielsen*, No. 18-2490, 2018 WL 4110549, at *3 (N.D. Cal. Aug. 29, 2018).

2          While the *Mathews* factors may be well-suited to determining whether due process requires

3  a second bond hearing, they are not particularly probative of whether prolonged mandatory

4  detention has become unreasonable in a particular case.  Accordingly, the Court declines to apply

5  the *Mathews* factors in this case.  Instead, the Court adopts the multi-factor test that many other

6  courts have relied upon to determine whether § 1225(b) detention has become unreasonable.  To

7  reiterate, the Court considers "(1) the total length of detention to date; (2) the likely duration of

8  future detention; (3) the conditions of detention; (4) delays in the removal proceedings caused by

9  the detainee; (5) delays in the removal proceedings caused by the government; and (6) the

10  likelihood that the removal proceedings will result in a final order of removal."  *Jamal*, 358 F.

11  Supp. 3d 853, at *3.  The Court discusses each factor below.

12          First, the Court considers the length of detention, which is the most important factor.  *E.g.*,

13  *id.*; *Sajous*, 2018 WL 2357266, at *10 (citing *Zadvydas*, *Sopo*, and *Diop*).  "It is important to bear

14  in mind the context: The detention that is being examined here is the detention of a human being

15  who has never been found to pose a danger to the community or to be likely to flee if released."

16  *Jamal*, 358 F. Supp. 3d 853, at *3.  Petitioner has been in detention for approximately 17 months,

17  which is a very long time.  *See id.* (granting bond hearing after 19 months detention); *Lett*, 346 F.

18  Supp. 3d at 387 (granting bond hearing after more than 10 months detention); *Brissett*, 324 F.

19  Supp. 3d at 452 (granting bond hearing after more than 9 months detention); *Bermudez Paiz*, 2018

20  WL 6928794, at *1 (recommending granting bond hearing after 16 months detention); *Perez*, 2018

21  WL 3991497, at *5 (granting bond hearing after 9 months detention).  The length of petitioner's

22  detention strongly favors granting him a bond hearing.

23          Second, the Court considers how long the detention is likely to continue absent judicial

REPORT AND RECOMMENDATION - 19

1   intervention; in other words, the "anticipated duration of all removal proceedings—including

2   administrative and judicial appeals." *Jamal*, 358 F. Supp. 3d 853, at *3 (internal quotations and

3   citation omitted).  Petitioner only recently filed his appeal of the IJ's removal order with the BIA.

4   If the BIA affirms, petitioner will have the opportunity to seek review in the Ninth Circuit.  This

5   process may take up to two years or longer. *See id.* at *4.  This factor favors granting petitioner a

6   bond hearing.

7   Third, the Court considers the conditions of the detention facility where the petitioner is

8   detained. *Id.*  "The more that the conditions under which the [noncitizen] is being held resemble

9   penal confinement, the stronger his argument that he is entitled to a bond hearing." *Id.* (quoted

10  source omitted).  Neither party has submitted evidence regarding the conditions of petitioner's

11  confinement at the Northwest Detention Center, and therefore the Court concludes that this factor

12  is neutral.

13  Fourth, the Court considers the nature and extent of any delays in the removal proceedings

14  that petitioner caused. *Id.*  Courts should be "sensitive to the possibility that dilatory tactics by the

15  removable [noncitizen] may serve not only to put off the final day of deportation, but also to

16  compel a determination that the [noncitizen] must be released because of the length of his

17  incarceration." *Ly*, 351 F.3d at 272; *see also Sopo*, 825 F.3d at 1218 ("Evidence that the

18  [noncitizen] acted in bad faith or sought to deliberately slow the proceedings in hopes of obtaining

19  release cuts against the [noncitizen].").  The Government implies that petitioner delayed the

20  proceedings by insisting on having a Chichewa interpreter even though he is "fairly proficient" in

21  English. Dkt. 6 at 11.  Petitioner responds that he was entitled to appropriate interpretation services

22  and that he needed them given the high stakes involved in asylum proceedings.  Dkt. 9 at 12 n.3

23  (citing 8 U.S.C. § 1229a(b)(4); *Perez-Lastor v. INS*, 208 F.3d 773, 778 (9th Cir. 2001); *He v.*

1    *Ashcroft*, 328 F.3d 593, 599 (9th Cir. 2003)).

2         "It is long-settled that a competent translation is fundamental to a full and fair hearing.  If

3    [a noncitizen] does not speak English, deportation proceedings must be translated into a language

4    the [noncitizen] understands."  *Perez-Lastor*, 208 F.3d at 778.  The IJ found that petitioner

5    understood the conversations he had in English with both the official at the U.S. Embassy in

6    Malawi and the CBPO upon his arrival at the Seattle/Tacoma International Airport.  Dkt. 12-1 at

7    14-16.  This finding and the evidence upon which it was based calls into question whether

8    petitioner needed a translator during his removal proceedings.  Nevertheless, there is no dispute

9    that petitioner's native language is Chichewa, and even a proficient English speaker could benefit

10   from translation into his or her native language given the importance of removal proceedings.

11   Moreover, there is no indication that petitioner deliberately sought to delay the proceedings to

12   obtain a bond hearing; the record does not suggest he knew it would be difficult for the government

13   to secure a Chichewa interpreter, he has never asked for a continuance, and given the unsettled

14   state of the law since *Jennings*, he had no way of knowing whether the length of his detention

15   would entitle him to a bond hearing.  In short, the Court finds that petitioner did not engage in

16   dilatory tactics.

17        Fifth, the Court considers the nature and extent of any delays in the removal proceedings

18   caused by the government.  *Jamal*, 352 F. Supp. 3d 235, at *4; *Sajous*, 2018 WL 2357266, at *11

19   ("If immigration officials have caused delay, it weighs in favor of finding continued detention

20   unreasonable. . . .  Continued detention will also appear more unreasonable when the delay in the

21   proceedings was caused by the immigration court or other non-ICE government officials." (citing

22   *Demore* and *Reid*)).  In this case, essentially all the delay between petitioner's first master calendar

23   hearing on January 9, 2018, and his merits hearing on February 26, 2019, was caused by the lack

REPORT AND RECOMMENDATION - 21

1    of an appropriate interpreter or DHS's request for a continuance.  The Government tries to place

2    the blame for the difficulties securing an interpreter on the Executive Office for Immigration

3    Review, which is the agency responsible for arranging interpretation services for immigration

4    court hearings.  *See* Dkt. 6 at 11; Dkt. 7 at ¶ 12.  But regardless of which agency caused the delay,

5    it is attributable to the Government, not petitioner.  *See Sajous*, 2018 WL 2357266, at *11 (citing

6    *Ly* for the proposition that "the operative question should be whether the [noncitizen] has been the

7    cause of the delayed immigration proceeding and, where the fault is attributable to some entity

8    other than the [noncitizen], the factor will weigh in favor of concluding that continued detention

9    without a bond hearing is unreasonable").  This factor favors granting petitioner a bond hearing.

10        Finally, the Court considers "the likelihood that the final proceedings will culminate in a

11    final order of removal."  *Jamal*, 358 F. Supp. 3d 853, at *4.  In other words, the Court considers

12    whether the noncitizen has asserted any defenses to removal.  *Sajous*, 2018 WL 2357266, at *11.

13    Where a noncitizen has not asserted any grounds for relief from removal, presumably the

14    noncitizen will be removed from the United States, and continued detention will at least marginally

15    serve the purpose of detention, namely assuring the noncitizen is removed as ordered.  *Id.* (citing

16    *Demore*).  But where a noncitizen has asserted a good faith challenge to removal, "the categorical

17    nature of the detention will become increasingly unreasonable."  *Id.* (quoting *Reid*, 819 F.3d at

18    400-500).  Petitioner here submitted an asylum application, but IJ denied his requests for relief.

19    Dkt. 12-1.  Petitioner has appealed that determination, and the Court does not have sufficient

20    information to determine whether the appeal is nonfrivolous or whether petitioner ultimately will

21    prevail.  Accordingly, the Court concludes that this factor does not weigh in favor of either party.

22        In sum, four of the six factors weigh in favor of granting petitioner a bond hearing, and two

23    factors are neutral.  The Court thus concludes that petitioner's continued mandatory detention

1    under § 1225(b) has become unreasonable and that due process requires the Government to provide

2    him with a bond hearing.

3    D.    Petitioner's bond hearing must comply with established procedural requirements

4         Petitioner contends that at his bond hearing, the Government must provide clear and

5    convincing evidence to justify his continued detention.  Dkt. 9 at 13-15.  The Court agrees.  "To

6    detain a noncitizen for a prolonged period of time while removal proceedings are pending, due

7    process requires the government to show by clear and convincing evidence that the detainee

8    presents a flight risk or a danger to the community at the time of the bond hearing."  *Calderon-*

9    *Rodriguez v. Wilcox*, No. 18-1373, 2019 WL 487709, at *6 (W.D. Wash. Jan. 9, 2019), *R & R*

10   *adopted*, 2019 WL 486409 (W.D. Wash. Feb. 7, 2019) (citing *Singh v. Holder*, 638 F.3d 1196,

11   1208 (9th Cir. 2011)); *see also Cortez v. Sessions*, 318 F. Supp. 3d 1134, 1146-47 (N.D. Cal. 2018)

12   (holding that *Singh*'s standards continue to apply to prolonged detention bond hearings post-

13   *Jennings*); *Guerrero-Sanchez v. Warden York Cnty. Prison*, 905 F.3d 208, 224 n.12 (3d Cir. 2018)

14   (adopting *Singh*'s clear and convincing evidence standard post-*Jennings*); *Darko v. Sessions*, 342

15   F. Supp. 3d 429, 435-36 (S.D.N.Y. 2018) (same); *Lett*, 346 F. Supp. 3d at 389 (adopting clear and

16   convincing evidence standard in § 1225(b) unreasonable detention case).  The bond hearing also

17   must comply with *Singh*'s other procedural requirements.  *See Singh*, 638 F.3d at 1206-08.

18   E.    Petitioner is not entitled to relief under the Eighth Amendment

19        Petitioner claims that his continued detention without a bond hearing violates the Eighth

20   Amendment's excessive bail clause.  Dkt. 1 at ¶¶ 78-81.  He alleges that the Government's

21   categorical denial of bail to certain noncitizens violates the Eighth Amendment.  *Id.* at ¶ 80.  As

22   noted above, the parties did not address this claim in their briefing.

23        The Eighth Amendment states, "Excessive bail shall be required . . . ."  U.S. Const.

Amend. VIII.  The Excessive Bail Clause does not "accord a right to bail in all cases, but merely [provides] that bail shall not be excessive in those cases where it is proper to grant bail." *Carlson v. Landon*, 342 U.S. 524, 545 (1952); *see also Leader v. Blackman*, 744 F. Supp. 500, 509 (S.D.N.Y. 1990) ("It is well settled that bail may be denied under many circumstances, including deportation cases, without violating any constitutional rights.").  As petitioner fails to point to any authority establishing that it is proper to grant him bail under the Eighth Amendment, the Court recommends that his Eighth Amendment claim be denied.

IV.    <u>CONCLUSION</u>

The Court recommends that the Government's motion to dismiss, Dkt. 6, be DENIED, petitioner's habeas petition, Dkt. 1, be GRANTED, and the Government be ordered to provide petitioner with an individualized bond hearing that complies with the requirements set forth in *Singh v. Holder*, 638 F.3d 1196 (9th Cir. 2011), within 30 days of the order on this Report and Recommendation.  A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and Recommendation is signed.  Failure to file objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed.  Responses to objections may be filed within **fourteen (14)** days after service of objections.  If no timely objections are filed, the matter will be ready for consideration by the District Judge on **<u>April 26, 2019</u>**.

Dated this <u>10th</u> day of April, 2019.

Mary Alice Theiler
United States Magistrate Judge